In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-3061

SANDRA HUNTER and MARLA STRAPPE,

*Plaintiffs-Appellants,*

*v.*

ELANCO ANIMAL HEALTH INCORPORATED, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cv-01460 — **Sarah Evans Barker**, *Judge.*

_____

ARGUED MAY 23, 2024 — DECIDED AUGUST 14, 2026

_____

Before JACKSON-AKIWUMI, LEE, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* This appeal arises from the dismissal of a proposed securities class action lawsuit against Elanco Animal Health Inc. and several of its officers and directors (collectively, "Elanco"). Lead Plaintiff Sandra Hunter and plaintiff Marla Strappe (collectively, "Plaintiffs"), proposing to lead a class of investors, alleged that Elanco deceived the securities market by asserting that there was significant underlying demand for Elanco's products when, in fact, the

demand was a facade created by so-called "channel stuffing." Channel stuffing is the practice of foisting inventory on distributors to create an illusion of greater profitability.

Concluding Plaintiffs failed to state a claim and that their proposed amendment was futile, the district court dismissed the lawsuit with prejudice. On appeal, Plaintiffs assert that their proposed second amended complaint states claims under the Securities Act of 1933 and the Securities Exchange Act of 1934. We conclude, however, that Plaintiffs have not met the heightened pleading standards of the Private Securities Litigation Reform Act or Federal Rule of Civil Procedure 9(b). Accordingly, we affirm the district court's judgment dismissing the case.

## I.   BACKGROUND

Because the proposed second amended complaint was dismissed for failure to state a claim, we accept the Plaintiffs' factual allegations as true. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("*Tellabs II*").

### A.  Factual Background

#### 1.  *Elanco's Business Model*

Elanco Animal Health Inc. is an Indiana corporation that was spun off from Eli Lilly and Company as a separate corporate entity in September 2018. About 97% of Elanco's revenue comes from Elanco's health products for "companion animals" (i.e., pets) and "food animals" (e.g., swine, cattle, and poultry).

Elanco primarily sells its animal health products to wholesale distributors, who in turn sell those products to the eventual end users of those products, such as veterinary clinics.

Before its spin off as a separate corporate entity, Elanco employed a "move out" sales model that prioritized balancing sales to distributors with end-user demand. In other words, Elanco strove to sell the amount of products its distributor customers needed to meet that end-user demand. In about the fourth quarter of 2017, however, Elanco switched to a "move in" sales model. A move-in sales model "incentivizes distributors to purchase as much product as possible" by offering discounts, rebates, and other favorable terms, "rather than aiming to balance sales to true end-user demand." Put another way, the amount Elanco decided to sell to its distributor customers—with less regard for the amount end users demanded—was the controlling metric for this sales model.

Elanco also expanded its business on occasion by acquiring smaller companies. For example, on April 26, 2019, Elanco announced that it planned to acquire Aratana Therapeutics, a company focused on commercializing therapeutics for dogs and cats, in a transaction valued at $245 million. The acquisition closed on July 18, 2019. In exchange for Aratana shareholders' stock in Aratana, Elanco issued about 7.2 million new shares of stock in Elanco. Those new shares were valued at $238 million based on Elanco's stock price ($33.18 per share) the day before the transaction closed.

In another example, on August 20, 2019, Elanco announced it planned to acquire Bayer Animal Health's animal health business. That deal was worth a total of $7.6 billion, consisting of $5.3 billion in cash and the rest in a stock offering. The deal closed on August 3, 2020, though Elanco announced the sale of shares to help finance the deal as early as January 21, 2020.

## 2. *Elanco's Alleged Channel-Stuffing Practices*

The "core" of this lawsuit is the allegation that Elanco deceived the market by asserting that strong end-user demand for Elanco's products drove Elanco's revenues when, in fact, those revenues resulted from channel stuffing.

The proposed second amended complaint's allegations rest partly on publicly available information, such as Elanco's public statements through its Chief Executive Officer Jeffrey Simmons, Chief Financial Officer Todd Young, and various other corporate filings. The Plaintiffs also relied on information provided by five anonymous former Elanco employees. Though the complaint does not reveal these former employees' identities, it does provide varying degrees of information about each one to bolster the credibility of their anonymous reports.

Confidential Witness 1 (CW1) was a "Corporate Account Manager" in Elanco's Food Animal division from January 2015 through January 2020. CW1 managed Elanco's relationship with four of Elanco's critical distributors, including MWI Animal Health, Elanco's largest distributor. CW1 reported to Courtney Shriver, an Elanco employee who oversaw Elanco's Food Animal and Companion Animal channel distribution and "had a 'direct conversation pipeline'" to, and participated in "monthly management meetings" with, Simmons. CW1 also participated in at least two of those meetings, during which sales strategy, sales data, and distributor inventory levels were reviewed.

Confidential Witness 2 (CW2) was also a "Corporate Account Manager" who worked in "Elanco's Companion Animal division" from March 2018 to January 2020. CW2 also

reported to Shriver and worked on the MWI account, apparently because CW2 used to work at MWI as a "National Account Manager."

Confidential Witness 3 (CW3) "was a National Accounts Manager in Elanco's Food Animal division from January 2015 to January 2020." CW3 was also involved in managing the MWI account, worked with CW1, and reported to Shriver.

Confidential Witness 4 (CW4), a former Vice President at Elanco from January 2020 to July 2020, is the highest-ranking confidential witness. Before January 2020, CW4 was "Elanco's Global Head of Animal Care Expansion, Business Development & Licensing and Alternate Innovation from September 2018 to January 2020." CW4 worked with and had "regular and frequent direct contact" with both Simmons and Young. CW4 also attended "monthly meetings" hosted by Young.

Confidential Witness 5 (CW5) was "a District Sales Manager" from January 2017 until March 2020, when CW5 became "a Senior District Sales Manager." CW5 changed roles in April 2020 to "National Account Manager" for one of Elanco's major veterinary accounts, "which ran exclusively through" MWI.

The confidential witnesses provided insight into Elanco's sales operations. CW1 and CW2 report that, before and during the class period, Elanco pushed hard to sell its products to distributors, even when those distributors already had significant product on hand. Elanco incentivized distributors to take on additional product by "offering discounts, additional rebates, and extended payment terms."

These incentives were tied to distributors' purchases from Elanco, not the distributors' sales to end users. According to

CW4, Elanco's goal was "to induce distributors to purchase more and more inventory regardless of end-user demand." For example, CW1 says that by the end of the second quarter of 2019, MWI had greater than typical reserves of Elanco inventory, yet Shriver directed CW1 to sell an extra $10 million of inventory to MWI anyway. To achieve that goal, CW1 had to offer MWI extra rebates. CW2 says that Elanco kept close track of MWI's "days-on-hand" inventory levels, so Elanco knew that MWI had more inventory than it typically stored. In fact, MWI ended up renting additional storage space for the excess inventory it purchased.

CW3 reports similar pressure to sell inventory to distributors who were already "bursting" with inventory. CW3 reports that Shriver would relay Simmons's instructions to "make the quarter['s sales goals] no matter what." Shriver would also push CW3 to try to get distributors to purchase "an extra million" in inventory "to make the quarter look better."

CW4 reports that Simmons and Young were well aware of these sales pressures and the resulting consistent difference "between dispensing numbers and selling numbers." During these meetings, CW4, Simmons, Young, and others reviewed the data and, by 2019, "senior executives challenged Simmons on Elanco's apparent channel stuffing."

Even so, Elanco's sales strategy did not result in distributors returning more products. In 2018, Elanco had a product return rate equal to 0.6% of net revenues. That figure dropped to 0.2% of net revenues in 2019.

In 2019, Elanco posted revenues of $781.6 million in the second quarter, $771.3 million in the third quarter, and

$787 million in the fourth. Elanco touted these revenues in its press releases and earnings calls.

On May 9, 2019, Elanco announced its first quarter 2019 financial results in a press release and a subsequent earnings call. The release stated that Elanco's 2% sales growth "reflect[ed] underlying volume growth." During the earnings call, Simmons said that "it's particularly important to put our sales results into context. My key message is that the fundamentals of our business are strong and we are tracking to our goals." He went on to say that "the leading indicators of demand at the vet clinic are consistent with this longer-term sales trajectory." Later, Young responded to a market analyst's question about "distributor stocking dynamics" that hurt quarterly earnings by saying that "we feel very good about the underlying demand in the vet channel." Another analyst on the same call followed up, asking for more detail about Elanco's growth. Simmons responded that "we look every day at that vet clinic demand. We feel very good about that. That's the lead indicator."

In a press release on August 13, 2019, Elanco announced its second quarter 2019 financial results. The press release stated that the "results reflect underlying price and volume growth." It quoted Simmons as stating Elanco was "confident in the growth of our underlying business." The same day, Elanco hosted an earnings call. On the call, Simmons stated that "[o]ur top line results represent the solid underlying demand for our products and the strength of our fundamentals." In response to an analyst's questions on that call about "true underlying organic growth," Simmons reported that "we're growing the underlying demand for core revenue … at 5%."

On November 6, 2019, Elanco announced its financial re-sults for the third quarter. In an earnings call the same day, Simmons said that "our top line results showed a solid under-lying demand for our products and the strength of our funda-mentals." Young, on the same call, said that Elanco was "con-fident in the underlying growth of our core business."

On January 10, 2020, Elanco held a guidance call to discuss Elanco's financial guidance. During the call, Simmons stated that "[o]ur growth is durable and resilient" and that "we are confident in our growth because of the fundamentals driving this growth."

Meanwhile, according to CW4, Elanco's channel stuffing peaked in the fourth quarter of 2019. By that point, says CW2, MWI had "at least 100 to 120 days of inventory" on hand, far above the typical 45- to 60-day average. CW3 reports that a different distributor (Nutra Blend) refused to purchase inven-tory in excess of demand at about the same time.

Having reached the limits of its distributors' capacity in the fourth quarter of 2019, Elanco switched back to a "move out" sales model. In doing so, Elanco based distributors' in-centives on their sales to end users, not the distributors' pur-chases from Elanco.

### 3.  *The Channel Inventory Reduction Announcement*

On May 7, 2020, Elanco announced that, compared to the first quarter of 2019, its revenues in the first quarter of 2020 decreased by 10% "due to a reduction of approximately $60 million in channel inventory driven by factors resulting from the COVID-19 pandemic." On an earnings call the same day, Simmons announced that during the first quarter of 2020, Elanco "reduced the amount of product in distributor

inventory by approximately $60 million … and … expect[ed] to further reduce an additional $80 million to $100 million mainly in the second quarter." Elanco's stock price immediately fell from $22.93 to $19.88 per share, a 13% drop.[1]

### B. Procedural Background

Lead Plaintiff Sandra Hunter, who had purchased Elanco securities, filed a proposed class action against Elanco, Simmons, and Young. A few months later, Hunter and plaintiff Marla Strappe filed a first amended complaint against those parties, Elanco's board of directors, and its Chief Account Officer. The complaint alleged that Elanco artificially inflated its sales and growth numbers during the class period by oversaturating Elanco's product distribution channels beyond end-user demand. They alleged that Elanco's sales figures were misleading and that Elanco misled investors by attributing its revenue growth to underlying end-user demand rather than its practice of selling more product to its distributors than they could distribute. The ruse was revealed, the Plaintiffs alleged, when Elanco finally announced it had to reduce its channel inventory. The district court dismissed without prejudice the first amended complaint for failure to state a claim, giving the Plaintiffs 45 days to seek leave to amend their complaint.

The Plaintiffs timely sought leave to file their proposed second amended complaint. In this complaint, they sought to represent a class of people or entities who had purchased

---

[1] For fluctuations in Elanco's stock price, "[t]he parties have not used econometric methods to separate firm-specific changes from movements of the market as a whole, so we give raw numbers." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).

Elanco common stock between May 9, 2019, and May 6, 2020, and they clarified that they were alleging multiple statutory and regulatory violations arising from Elanco's failure to disclose its channel-stuffing practices. First, the Plaintiffs contend that Elanco, as a corporation, and Simmons and Young as individuals, violated § 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Securities and Exchange Commission (SEC) Rule 10b–5(b). *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. Second, the Plaintiffs allege that Elanco, Simmons, Young, Elanco's directors, and its Chief Account Officer are liable under § 11 of the Securities Act of 1933 (Securities Act) and Elanco is liable under § 12(a) of the Securities Act, in each case for making material misstatements. *See* 15 U.S.C. §§ 77k(a), 77*l*(a)(2). Third, the complaint alleges that Simmons, Young, Elanco's directors, and its Chief Account Officer are secondarily liable as "control persons" under § 15 of the Securities Act, *see* 15 U.S.C. § 77o(a), as are Simmons and Young under § 20 of the Exchange Act, *see* 15 U.S.C. § 78t(a), for the underlying securities fraud claims. Last, the complaint alleges that Elanco violated Item 303 of SEC Regulation S-K. *See* 17 C.F.R. § 229.303(a)(3)(ii) (2019).

The court denied leave to amend, concluding that permitting the proposed amendment was futile. The court started with the Plaintiffs' claim under Exchange Act § 10(b) and SEC Rule 10b–5(b). That claim required Plaintiffs to adequately plead six elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). The court held that under the heightened pleading standards required by the Private Securities Litigation Reform Act (PSLRA), Plaintiffs failed to adequately allege three

of those elements. First, in the court's view, the complaint failed to allege an actionable misstatement or omission because "only fraudulent channel stuffing is actionable," but the complaint did not suggest that Elanco had engaged in such a scheme. Second, the court concluded that the complaint did not allege a strong inference of scienter—that is, that Elanco, Simmons, or Young intended to deceive the market. To the court, the most compelling inference to draw from the complaint was that the COVID-19 pandemic caused the channel inventory reduction. Third, the court concluded that the complaint failed to allege that any misrepresentation caused the "minor decline" in Elanco's stock price.

The court then quickly dispensed with the Plaintiffs' remaining claims. The court held that the Plaintiffs' claims under §§ 11 and 12(a) of the Securities Act were "bestrewn with averments of fraud," so the Plaintiffs had to plead Elanco's alleged fraud with specificity under Federal Rule of Civil Procedure 9(b). But the complaint failed on that measure because it alleged neither "a channel stuffing scheme nor any material misstatements or omissions." And the claims under § 15 of the Securities Act and § 20(a) of the Exchange Act failed because there must be an underlying securities fraud before corporate officers can be secondarily liable.

The court thus denied leave to amend as futile and dismissed the complaint with prejudice.

Plaintiffs have timely appealed.

## II.   ANALYSIS

On appeal, Plaintiffs argue that their proposed second amended complaint stated claims under each of these provisions of law. "Generally, denials of leave to amend are

reviewed for abuse of discretion." *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015). "But when the basis for denial is futility, we apply the legal sufficiency standard of Rule 12(b)(6) to determine whether the proposed amended complaint fails to state a claim." *Id.* We review de novo the district court's conclusion that Plaintiffs failed to state a claim. *See Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006) ("*Tellabs I*"), *rev'd on other grounds*, *Tellabs II*, 551 U.S. 308. We review the court's interpretation of the PSLRA de novo, too. *Id.*

### A. Exchange Act Claim Under Section 10(b) and Rule 10b–5(b)

In the aftermath of the Great Depression, Congress enacted a set of securities laws that impose a burden of full disclosure on public companies. *Id.* at 595 (quoting *Sec. & Exch. Comm'n v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963)). Under § 10(b) of the Exchange Act, it is unlawful to "use or employ … any manipulative or deceptive device or contrivance" that violates SEC rules. 15 U.S.C. § 78j(b). Using its statutory authority to ensure honest market disclosures, the SEC promulgated Rule 10b–5, which provides that:

> It shall be unlawful for any person …
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of
business which operates or would operate as
a fraud or deceit upon any person,

in connection with the purchase or sale of any
security.

17 C.F.R. § 240.10b–5. These three provisions create independent grounds of liability, meaning that a violation of one provision does not depend on a violation of another. *See Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 78 (2019).

Though neither the statute nor the rule expressly creates a private right of action, the Supreme Court has held that § 10(b) provides an implied right of action by which private parties can seek to enforce § 10(b) and Rule 10b–5. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (citation omitted). The ability of private parties to enforce our securities laws creates significant, countervailing incentives. On the one hand, "[t]he magnitude of the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities cannot be overstated." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006). And "meritorious private actions … are an essential supplement" to federal enforcement of the securities laws. *Tellabs II*, 551 U.S. at 313. On the other hand, "[p]rivate securities fraud actions … can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Id.*

To combat perceived abuses in private securities litigation, Congress enacted the Private Securities Litigation Reform Act of 1995. *See id.* at 320–21 (describing the impetus for passing the PSLRA). Among other reforms, the PSLRA imposes a

significantly heightened pleading burden on private plain-
tiffs. *See* 15 U.S.C. § 78u–4(b). Plaintiffs must "state with par-
ticularity both the facts constituting the alleged violation, and
facts evidencing scienter." *Tellabs II*, 551 U.S. at 313 (cit-
ing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976),
and § 78u–4(b)(1), (2)). Put another way, the PSLRA imposes
two burdens. To satisfy the particularity requirement, the
complaint must list each allegedly misleading statement (or
omission) and explain why the statement (or omission) is mis-
leading. § 78u–4(b)(1). The complaint also must "state with
particularity facts giving rise to a strong inference" of scienter.
§ 78u–4(b)(2). Scienter, in this context, is "a mental state em-
bracing intent to deceive, manipulate, or defraud." *Ernst &
Ernst*, 425 U.S. at 193 n.12.

A "strong inference" of scienter is an inference that is
"more than merely plausible or reasonable—it must be cogent
and at least as compelling as any opposing inference of non-
fraudulent intent." *Tellabs II*, 551 U.S. at 314. In evaluating
competing inferences at the pleading stage, we still "accept all
factual allegations … as true," including those in the com-
plaint and documents incorporated by reference, and we
scrutinize the facts collectively, not in isolation. *See id.* at 322–
23. After reviewing the complaint holistically, and recogniz-
ing that the "inquiry is inherently comparative," we ask
whether "the inference of scienter [is] cogent and at least as
compelling as any opposing inference one could draw from
the facts alleged." *Id.* at 323–24.

With those pleading standards in mind, there are six
"basic elements" of a Rule 10b–5 claim: (1) "a material mis-
representation (or omission)," (2) "scienter," (3) "a connection
with the purchase or sale of a security," (4) "reliance,"

(5) "economic loss," and (6) "loss causation." *Dura Pharms.*, 544 U.S. at 341–42 (italics omitted). Notice that the first element has two parts: (1) a misrepresentation or omission (2) of material information. *Tellabs I*, 437 F.3d at 595. In other words, a misrepresentation of an immaterial fact does not create liability. *See id.*

In this case, the parties contest whether the proposed second amended complaint properly alleges that Elanco made a material misrepresentation or omission with scienter and caused the Plaintiffs' losses, so we limit our discussion accordingly. But we do not reach the issue of loss causation because we conclude that even if Plaintiffs' proposed complaint adequately alleges a material misrepresentation or omission, it fails to allege a strong inference of scienter.

### 1. *Material Misrepresentation or Omission*

The district court concluded that because Plaintiffs had not alleged Elanco's channel stuffing was itself a fraudulent practice, the court did not have to consider whether Plaintiffs adequately pleaded that defendants made misstatements or omissions about it. The Plaintiffs argue this was error. We agree. Whether a defendant makes a material misrepresentation under Rule 10b–5(b) does not depend on whether the underlying conduct or practice is fraudulent.

Rule 10b–5(b) prohibits the making of "any untrue statement of a material fact" or omitting "a material fact," the absence of which makes a statement misleading. 17 C.F.R. § 240.10b–5(b). As the Supreme Court explained in *Lorenzo*, liability under one subsection of Rule 10b–5 does not depend on liability under another subsection of the same rule. 587 U.S. at 78. Rule 10b–5(b) centers on untrue statements and

misleading omissions, not on whether the conduct underlying the statement is itself fraudulent—that is the domain of other parts of Rule 10b–5. *See* § 240.10b–5(a) (barring "any device, scheme, or artifice to defraud"); § 240.10b–5(c) (barring "engag[ement] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person"). Accordingly, an untrue statement or misleading omission relating to a legitimate business strategy is still prohibited under Rule 10b–5(b). *See* § 240.10b–5(b); *cf. Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs III*") (recognizing that channel stuffing is not inherently fraudulent). Under Rule 10b–5(b), the essential question is whether Elanco's statements or omissions were untrue or misleading, not whether their practice of channel stuffing was itself fraudulent. A fraudulent channel stuffing scheme may violate Rule 10b–5(a) or (c) too, but it is not a prerequisite for liability under Rule 10b–5(b).

Our colleagues in the Second Circuit were recently confronted with a similar scenario and came to much the same conclusion. In assessing Rule 10b–5, the Second Circuit noted that the Rule "prohibits three different things," and that "[c]lause (b) is significantly different" from (a) and (c) because "[i]t focuses not on schemes, devices, or practices, but on statements made." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 136 (2d Cir. 2021). The focus of Rule 10b–5(b), then, is on "whether something said was materially misleading." *Id.* So, because liability under Rule 10b–5(b) "does not depend on whether the alleged channel stuffing practices themselves were fraudulent or otherwise illegal," the Second Circuit concluded the district court erred in dismissing the complaint because the channel stuffing was not inherently fraudulent. *Id.* at 137. Given the text of Rule 10b–5(b) and the

Supreme Court's decision in *Lorenzo*, we agree with the Second Circuit that the success of a Rule 10b–5(b) claim depends on demonstrating misleading or untrue "statements," not fraudulent "schemes, devices, or practices." *Id.* at 136.

Here, the district court's view that "only fraudulent channel stuffing is actionable" led the court mostly to forgo analyzing whether Elanco's statements or omissions were material and misleading or untrue. We note that some of the statements made by Simmons and Young are at least close calls on this point. The proposed second amended complaint alleges that the executives gave specific assurances of strong underlying demand in response to specific analyst questions about Elanco's "stocking dynamics" and distributors' stocking practices. *Compare Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997) ("Mere sales puffery is not actionable under Rule 10b–5."), *with Tellabs I*, 437 F.3d at 597 (explaining "direct response[s] to" analysts' specific inquiries go "well beyond" immaterial puffery).

At bottom, however, we need not resolve the parties' dispute over whether these and other statements misleadingly assured investors of strong demand while omitting any reference to Elanco's channel stuffing practices. That is because we agree with the district court that the proposed second amended complaint fails to allege a strong inference of scienter.

### 2. *Scienter*

Recall that another required element of a Rule 10b–5 claim is scienter. *Dura Pharms.*, 544 U.S. at 341 (italics omitted). In other words, there must be allegations of "the defendant's

intention 'to deceive, manipulate, or defraud.'" *Tellabs II*, 551 U.S. at 313 (quoting *Ernst & Ernst*, 425 U.S. at 194 & n.12).

The PSLRA imposes heightened pleading requirements for the scienter element. *Id.* at 314. Plaintiffs who allege a claim under Rule 10b–5 must "state with particularity facts giving rise to a strong inference" of scienter. *Id.* (quoting 15 U.S.C. § 78u–4(b)(2)). Although the term "strong inference" is not defined by statute, *see* 15 U.S.C. § 78u–4(b)(2), the Supreme Court in *Tellabs II* explained that a strong inference of scienter is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314. This "inquiry is inherently comparative," meaning that we "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24.

To plead scienter with the requisite specificity, it is often necessary to get information from corporate insiders. *See Tellabs III*, 513 F.3d at 711. Yet those insiders frequently seek assurances that they will not suffer retaliation. One way to do so is for the plaintiffs to grant them anonymity at the pleading stage.[2] *Id.* So, it is common for securities fraud litigants, like the Plaintiffs here, to rely on confidential sources. *Tellabs I*, 437 F.3d at 596; *Tellabs III*, 513 F.3d at 711.

The problem with this arrangement "is that allegations based on anonymous informants are very difficult to assess." *Tellabs III*, 513 F.3d at 711. Accordingly, in *Higginbotham v.*

---

[2] That anonymity is temporary, though, because confidential witnesses' identities will have to be disclosed in pretrial discovery. *Tellabs III*, 513 F.3d at 711.

*Baxter International, Inc.*, after noting confidential witnesses' allegations must usually be discounted steeply, we discounted allegations based on five confidential witnesses' accounts. 495 F.3d 753, 756–57 (7th Cir. 2007). We did so in large part because we knew virtually nothing about their positions, their titles, their access to knowledge, or their motivations. *See id.* at 757. But the degree to which confidential witness testimony needs to be discounted is contextual. *Tellabs III*, 513 F.3d at 711–12. When numerous confidential sources tell an overlapping, corroborated story and we are able to assess those sources' access to the knowledge they claim to have, we can still draw "a strong inference from [the] informants' assertions." *Id.* at 712.

Here, the Plaintiffs rely on five confidential witnesses, only one of whom appears to have had personal access to knowledge about Simmons's and Young's mental states. Thus, allegations of scienter based on the accounts of CW1, CW2, CW3, and CW5 should be discounted steeply. *See Higginbotham*, 495 F.3d at 757. Based on what we can discern from the proposed second amended complaint about their positions and access to knowledge, there is no reason to think they have first-hand information about the defendants' mental states. The exception is CW4, a Vice President during the class period who attended monthly management meetings and interacted personally with Simmons and Young. Though we know nothing about CW4's motivations, a person in CW4's position would have access to the knowledge that CW4 claims to have. Moreover, CW4's version of events is at least partly corroborated by the proposed second amended complaint's other allegations. Thus, we choose not to steeply discount allegations based on CW4's testimony. *See Tellabs III*, 513 F.3d at 712.

With that preliminary point out of the way, we turn to the "inherently comparative" exercise that is determining whether the complaint raises a strong inference of scienter. *Tellabs II*, 551 U.S. at 323. We see three possible inferences regarding scienter that could be drawn from the allegations in the proposed second amended complaint.

*Inference One: COVID-19.* The district court concluded that the strongest inference to be drawn from the complaint regarding the defendants' scienter was that their decision to reduce channel inventory was based on the COVID-19 pandemic, not an intent to deceive the market. This flowed from the court's view that the Plaintiffs needed to allege that the underlying channel-stuffing scheme was fraudulent.

We respectfully disagree that this is the strongest inference to be drawn for two reasons. First, our focus is on whether the defendants' statements were misleading, not whether the underlying scheme itself was fraudulent. As a result, what matters is whether the defendants made knowingly false material statements (or made material omissions) with an intent to deceive the market, not whether COVID-19 was, in fact, the reason Elanco pared back its distributors' supply levels. *See Hain*, 20 F.4th at 136–37. Second, the proposed second amended complaint alleges that Elanco began the process of reducing distributors' inventory levels before the pandemic began. Indeed, Elanco switched back to a "move out" sales model in the fourth quarter of 2019 after maxing out its distributors' capacity. From that, it is hard to infer COVID-19 caused the reduction.

*Inference Two: Intentional Fraud.* Plaintiffs argue that the strongest inference to be drawn is that Simmons and Young knew demand for Elanco's products was weak but persisted

in claiming that sales growth was driven by strong end-user demand. Plaintiffs point out the following allegations in support. Simmons and Young publicly stated that they closely monitored demand levels. CW4 says that Simmons and Young attended monthly management meetings where they reviewed sales data, were informed of a consistent difference between sales and inventory levels and were challenged at least once on channel stuffing. After some of these meetings, CW1 was pressured to sell even more product to MWI, including at discounted rates. And as the alleged channel-stuffing scheme reached its peak, in November 2019 filings Elanco subtly adjusted its public disclosures about payment terms and noted that risks included "the impact of increased or decreased sales to our channel distributors resulting in higher or lower inventory levels … in advance of or trailing actual customer demand."

We agree that these allegations raise a plausible inference that Simmons and Young realized distributor inventory levels did not match end-user demand and they intended to deceive the market by omitting information about that difference. But under the PSLRA, the question is whether the Plaintiffs have raised a "strong inference" of scienter, not merely a plausible one. § 78u–4(b)(2); *see Tellabs II*, 551 U.S. at 314. To determine whether a plausible inference is a strong one, we must compare this inference to Elanco's proposed opposing inference of nonfraudulent intent, namely the pursuit of a legal sales strategy. *Tellabs II*, 551 U.S. at 323–24.

*Inference Three: Pursuit of a Legal Sales Strategy.* Elanco contends that the strongest inference to be drawn from the proposed second amended complaint is that Simmons and Young knew about Elanco's "move in" sales model and

approved it, but they did not intend to deceive anyone. As Elanco points out, there are no allegations that demand *was not* strong enough to sustain the channel-stuffing practice—the sales were real and, though distributors had substantial inventory, they were not returning it more frequently than before. More importantly for scienter, there is no allegation that Simmons or Young *knew* that demand was not strong or that the strategy was unsustainable over the long haul. In fact, despite the consistent difference between sales and inventory levels, distributors kept buying Elanco's products at a high rate and successfully selling them during the class period. There are no allegations that Elanco's revenues were reported improperly or that its financials had to be restated at any point. Relatedly, we know that Simmons was confronted by others about potential channel stuffing, but we have no information about Simmons's response to that charge. Moreover, there is no allegation that the sales were illusory, let alone that the defendants knew as much.

As we have recognized before, "there may be legitimate reasons for attempting to achieve sales earlier." *Tellabs I*, 437 F.3d at 598. To be sure, "[a] certain amount of channel stuffing could be innocent," as "a seller might have a realistic hope that stuffing the channel of distribution would incite his distributors to more vigorous efforts to sell the stuff lest it pile up in inventory." *Tellabs III*, 513 F.3d at 709. In contrast, "[c]hannel stuffing becomes a form of fraud only when it is used … to book revenues on the basis of goods shipped but not really sold because the buyer can return them." *Id.* Here, distributors' persistently low rate of returning Elanco products undermines an inference that Simmons, Young, and Elanco knew the "move in" sales model was fraudulent. Thus, we think the strongest inference to be drawn from the

proposed second amended complaint is that Simmons, Young, and Elanco had a realistic hope that their efforts to incentivize their distributors were working. *See id.* Perhaps Simmons and Young were overly optimistic in pursuing a channel stuffing strategy, but "there is no securities fraud by hindsight." *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012) (citation omitted). Simmons and Young pursued a lawful sales strategy that worked for nearly two years. In the absence of allegations establishing that Simmons or Young knew that their channel-stuffing practice was going to implode but kept saying demand was strong anyway, we cannot draw a strong inference of fraudulent intent.

Plaintiffs contend Simmons's and Young's alleged motives should change our analysis, but we disagree. The Plaintiffs point out that Simmons and Young likely wanted to keep stock prices high to facilitate the Aratana acquisition and the January 2020 equity offering that financed part of the Bayer acquisition. We recognize that motive can be a "relevant consideration" in assessing fraudulent intent. *Tellabs II*, 551 U.S. at 325. But every executive is motivated to keep their company's stock price high, and a motive shared by all executives does not move the scienter needle. *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 939–40 (7th Cir. 2018). There is also a timing mismatch for both transactions. Elanco switched to a "move in" sales model around the fourth quarter of 2017, well before Elanco announced the Aratana acquisition in April 2019, and kept this model well after that transaction closed in July 2019. And if the goal was to inflate the stock price for the January 2020 equity offering, Elanco's decision to end its channel-stuffing practice in the fourth quarter of 2019 may fit uneasily with that alleged motivation. In short, the motives alleged here do not move the scienter needle.

We conclude the Plaintiffs have not adequately pleaded a strong inference of scienter—that Simmons, Young, or Elanco knew they were misleading investors by omitting channel stuffing from their explanations of sales growth. And for that reason, we do not consider whether the Plaintiffs adequately pleaded loss causation.

In sum, the district court was right to dismiss the Plaintiffs' claims that arise under § 10 of the Exchange Act and SEC Rule 10b–5(b).

### B. Securities Act Claims Under Sections 11 and 12(a)(2)

The Plaintiffs' proposed second amended complaint alleges that two misleading statements in Elanco's Aratana Merger Registration Statement and Prospectus violate 15 U.S.C. §§ 77k(a) and 77*l*(a)(2).[3] Sections 11 and 12(a)(2) of the Securities Act prohibit material misstatements in registration statements and prospectuses, respectively. §§ 77k & 77*l*(a)(2). Unlike claims under § 10(b) of the Exchange Act, however, claims under §§ 11 and 12(a) of the Securities Act do not require proof of fraudulent intent—instead, these statutes create "virtually absolute" liability "even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375,

---

[3] Specifically, Elanco relayed that "[t]otal revenue increased $177.8 million or 6% in 2018 as compared to 2017, reflecting a 3% increase due to higher realized prices and a 3% increase due to higher volumes." This was misleading, Plaintiffs allege, because it omitted that the revenue growth was due to channel stuffing, not increased demand. In the same document, Elanco also stated that its risks included "increased use of alternative distribution channels, or changes within existing distribution channels, [which] could negatively impact its market share, margins and distribution of its products." This was misleading, Plaintiffs allege, because Elanco had *already* changed its distribution strategy.

382 (1983) (discussing Section 11); *see, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("Section 12(a)(2) imposes liability under similar circumstances for misstatements or omissions in a prospectus." (citing § 77*l*(a)(2))).

The threshold issue we must resolve is which pleading standard governs: Federal Rule of Civil Procedure 8(a) or 9(b). The district court decided that Rule 9(b) applied because the Plaintiffs' allegations were "bestrewn with averments of fraud." Concluding that the proposed second amended complaint could not meet Rule 9(b)'s heightened pleading requirements, the district court dismissed Plaintiffs' §§ 11 and 12(a) claims.

Under Federal Rule of Civil Procedure 8(a), a complaint merely needs to include a short and plain statement that plausibly suggests the plaintiff is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Rule 8 imposes, in essence, a "fair notice" rule that requires Plaintiffs to "give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (citation modified). This, of course, does not require comparing opposing inferences. *Id.* (citing by comparison *Tellabs III*, 513 F.3d at 705).

Federal Rule of Civil Procedure 9(b) imposes a higher pleading burden that applies to claims that sound in fraud. The Rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). This heightened pleading requirement applies to "averments of fraud," not just claims of fraud. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d

502, 507 (7th Cir. 2007). Thus, what matters is whether the allegations rest on fraud. If so, then Rule 9(b) kicks in, no matter whether the legal theory itself requires proof of fraud. *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003).

On appeal, Plaintiffs do not contend that they can satisfy the requirements of Rule 9(b); rather, they argue that Rule 8(a)'s more liberal standard applies because their claims do not rely on a fraud theory. In fact, the Securities Act section of their proposed second amended complaint expressly forsakes any reliance on fraud in favor of negligence and strict liability. Accordingly, our analysis begins and ends with the pleading standards.

Because proving fraud is not necessary under §§ 11 or 12(a), *Huddleston*, 459 U.S. at 382; *Panther Partners*, 681 F.3d at 120, whether we apply Federal Rule of Civil Procedure 8(a) or 9(b) depends on the allegations of the complaint. *See Kennedy*, 348 F.3d at 593; *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008). Rule 8(a) applies when the complaint alleges negligence or strict liability; Rule 9(b) applies when the complaint relies on allegations of fraud. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004); *see also Sears v. Likens*, 912 F.2d 889, 892–93 (7th Cir. 1990) (applying Rule 9(b) to Securities Act claims, including those brought under § 12). If the complaint alleges both fraud-based and non-fraud-based theories of relief, the proper course is to separate the fraud allegations and then consider whether what is left states a claim under Rule 8. *Kennedy*, 348 F.3d at 593. If the complaint relies on "a course of fraudulent conduct," however, the complaint "sounds in fraud" and Rule 9(b) applies. *Borsellino*, 477 F.3d at 507 (citation modified).

We agree with the majority of courts to have resolved the issue that when the same course of conduct allegedly violates Rule 10b–5 and §§ 11 and 12(a) of the Securities Act, then Rule 9(b) governs the §§ 11 and 12(a) theories. *Rombach*, 355 F.3d at 171, 175; *Cozzarelli*, 549 F.3d at 629; *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); *but see In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997) (applying Rule 8 to claims under Securities Act §§ 11 and 12(a) when plaintiffs "expressly disavow[ed] any claim of fraud in connection" with those claims). If "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud." *Rubke*, 551 F.3d at 1161 (citation omitted). Nor can a plaintiff "escape the requirements of Rule 9(b) by adding a superficial label of negligence or strict liability." *Cozzarelli*, 549 F.3d at 629. What matters is whether the allegation "has the substance of fraud." *Id.*

We conclude that Plaintiffs' claims under §§ 11 and 12(a) of the Securities Act sound in fraud because "[t]he complaint treats the allegedly false statements … as part of a single, coordinated scheme to defraud investors." *Id.* The proposed second amended complaint alleges a single course of conduct: Elanco's alleged habit of failing to mention that its revenues were bolstered by its channel-stuffing practices. In relation to their Rule 10b–5(b) theory, the Plaintiffs allege that Elanco's financial statements, press releases, and earnings calls were all fraudulent because they misleadingly omitted the fact that Elanco was engaging in channel stuffing. Then, in relation to their §§ 11 and 12(a) claims, the Plaintiffs maintain that the Aratana Merger Statement and Prospectus negligently, but misleadingly, omitted that Elanco was engaged in channel

stuffing. The documents that contained the misleading state-
ments differ, but the reason that they are allegedly misleading
is the same.

In the first batch of omissions, the Plaintiffs assert know-
ing, intentional deceit; in the second, they assert negligent
omission. But the substance of those allegations suggests a
single course of conduct carried out across various medi-
ums—in other words, the misleading omissions are all "part
of a single, coordinated scheme to defraud investors." *Cozza-
relli*, 549 F.3d at 629. The same course of conduct is used to
support both the Plaintiffs' Rule 10b–5 theory and their Secu-
rities Act §§ 11 and 12(a) theories, so the heightened pleading
standard under Rule 9(b) applies. *See id.*; *Rombach*, 355 F.3d at
171–72; *Rubke*, 551 F.3d at 1161.

The fact that the proposed second amended complaint ex-
pressly disavows a fraud theory does not change our analysis.
We look to "the substance of [P]laintiffs' allegations," not to
"a conclusory disclaimer." *Cozzarelli*, 549 F.3d at 629; *see also
Rombach*, 355 F.3d at 172 (rejecting an express-disavowal rule);
*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160–61
(3d Cir. 2004) (same). Despite the disclaimer, Plaintiffs allege
that Elanco's statements were "false and misleading," a char-
acterization that is "classically associated with fraud." *Rom-
bach*, 355 F.3d at 172. Indeed, the entire basis of this lawsuit is
Elanco's practice of withholding from investors information
about channel stuffing. Prioritizing substance over form, we
conclude that the "gravamen of the complaint is plainly
fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th
Cir. 1996).

We recognize that the Fifth and Eighth Circuits appear to
disagree with the Second, Third, Fourth, and Ninth Circuits

on this point. It appears that the Fifth Circuit has held that if the complaint expressly disavows reliance on a fraud theory, then Rule 8 applies. *See Lonestar Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368–69 (5th Cir. 2001). But our case is distinguishable because the complaint at issue in *Lonestar* alleged claims under the Securities Act only. *See id.* at 367. Here, the Plaintiffs have asserted claims under both the Securities Act and the Exchange Act, raising the problem of using the same course of conduct to prove violations of both Acts. *See Rubke*, 551 F.3d at 1161.

In *NationsMart*, the Eighth Circuit confronted claims under both the Securities Act and the Exchange Act. The Eighth Circuit appears to have adopted an express disavowal rule: "[T]he plaintiffs made clear that they did not allege in the context of their § 11 claim that the defendants were liable for fraudulent or intentional conduct. … Therefore, their claim should not have been dismissed for failing to comply with Rule 9(b)." 130 F.3d at 315. But that statement followed from the Eighth Circuit's conclusion that "Rule 9(b) does not apply to claims under § 11 of the Securities Act" because § 11 claims do not require proof of fraud. *Id.* at 314. We implicitly rejected that position in *Kennedy*, when we pointed out that if a plaintiff charges a fraudulent violation of a statute that does not require proof of fraud, compliance with Rule 9(b) is still required. 348 F.3d at 593. Similarly, we do not think that simply disavowing reliance on a fraud theory is sufficient to remove a complaint from the auspices of Rule 9(b); instead, we choose substance over form. *See Cozzarelli*, 549 F.3d at 629. The point of Rule 9(b) is to protect defendants from frivolous allegations of fraud and to "discourage a 'sue first, ask questions later' philosophy" when it comes to fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441

(7th Cir. 2011) (citations omitted). We decline to create a significant loophole by permitting Plaintiffs to allege fraud in substance but avoid Rule 9(b)'s heightened pleading standard by including formalistic disavowals. *See Cozzarelli*, 549 F.3d at 629; *Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 160–61.

Plaintiffs do not argue on appeal that their proposed second amended complaint satisfies the Rule 9(b) standard, and we will not craft any such argument on their behalf. *See Bradley v. Village of University Park*, 59 F.4th 887, 897–98 (7th Cir. 2023). Accordingly, we conclude that the district court both properly applied Rule 9(b) and correctly dismissed Plaintiffs' claims under §§ 11 and 12(a)(2) of the Securities Act.

### C.  Item 303 Claim

Plaintiffs separately allege that Elanco violated Item 303 of SEC Regulation S-K when it failed to disclose its channel-stuffing practices in the Aratana Merger Registration Statement and Prospectus as a "known trend." Under § 13(a) of the Exchange Act, Elanco was required to file periodic informational statements. *See* 15 U.S.C. §§ 78m(a)(1), 78*l*(b)(1). Among those statements is Item 303. The version in effect at the relevant time required Elanco to disclose "known trends or uncertainties that have had or [reasonably can be expected to have] a material favorable or unfavorable impact on net sales or revenues … from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (2019). The failure to make a disclosure required by Item 303 can support a claim under § 11 of the Securities Act. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264–65 (2024); *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013); *see also Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("[F]ailing to comply with Item 303 by omitting known trends

or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933."), *overruled on other grounds by*, *Macquarie Infrastructure Corp.*, 601 U.S. at 262–63.

It would be futile to grant Plaintiffs leave to amend this claim. As the Second Circuit has explained, the "trends" that Item 303 deals with are external trends that might affect a company's exposure, not internal business strategies for dealing with those trends. *Stratte-McClure*, 776 F.3d at 105. In this case, the channel stuffing practices that Plaintiffs have alleged appear to be internal sales strategies, not external trends in the market. We are reluctant to interpret Item 303 in a way that "requires companies to give competitors notice of proprietary strategies and information." *Id.* We conclude that Elanco did not run afoul of Item 303 by failing to disclose that it was using a "move in" sales strategy that heavily incentivized distributors to purchase above-average levels of Elanco product.

## D. Securities Act Claim Under Section 15 and Exchange Act Claim Under Section 20(a)

The Exchange Act and the Securities Act create secondary liability for "control persons"—those who "directly or indirectly" control the alleged violator. *See Tellabs I*, 437 F.3d at 605 (citation omitted). Secondary liability under § 20(a) of the Exchange Act depends on whether the Plaintiffs have alleged an independent violation of the Exchange Act. *See* 15 U.S.C. § 78t(a). "[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws— here, a violation of § 10(b) and Rule 10b–5." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citation omitted). Given our conclusion that the Plaintiffs have failed to state a claim under Rule 10b–5(b), we affirm the dismissal of the § 20(a)

claim, too. Similarly, liability under § 15 of the Securities Act depends on a viable claim of securities fraud. *See* 15 U.S.C. § 77o(a); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994). Thus, we also affirm dismissal of the § 15 claim.

### III.    CONCLUSION

For these reasons, we AFFIRM the district court's judgment in all respects.